[L. A. No. 4516. In Bank.—February 18, 1919.]

PEOPLES LUMBER COMPANY (a Corporation), Respondent, v. McINTYRE & PETERS (a Copartnership), etc., Defendants; WILLIAM L. PETERS, Appellant.

PARTNERSHIP — RECOVERY FOR MATERIALS — CONTRACT WITH ALLEGED PARTNER—EXISTENCE OF PARTNERSHIP—FINDING NOT SUSTAINED BY EVIDENCE.—In this action against an alleged copartnership to recover for material furnished to one of the alleged partners, it is held the finding of the existence of a copartnership is not sustained by the evidence.

APPEAL from a judgment of the Superior Court of Ventura County. Merle J. Rogers, Judge. Reversed.

The facts are stated in the opinion of the court.

Purington & Adair and McFarland & Irving, for Appellant.

George E. Farrand and Bowker & Sheridan, for Respondent.

WILBUR, J.—Plaintiff recovered a judgment against McIntyre and Peters for material furnished to McIntyre, it being alleged that Peters was a copartner of McIntyre, and the court so finding. Peters appealed from the judgment. At the time of the contract between the plaintiff and McIntyre the plaintiff had never heard of the alleged partnership, and its claim is therefore not based upon the theory of an ostensible partnership, but upon the character of the actual agreement between Peters and McIntyre. The finding that such partnership existed is attacked for lack of evidence to sustain it. The

evidence is substantially without conflict. Both Peters and McIntyre were witnesses in the case, but neither testified to the existence of a partnership agreement between them. Their business relations were fixed by a written contract dated October 9, 1911. This contract did not of itself create a copartnership, but it is claimed that the subsequent letters and dealings between the parties justify the conclusion that a copartnership existed at the time plaintiff contracted with McIntyre.

To understand the relations of the parties it will be necessary to consider the terms of the written agreement and the evidence of subsequent dealings between the defendants. The written contract provided for a tentative arrangement between defendants for the doing of certain street work under the Vrooman Act, by contract, in the city of Pomona, and for the subsequent formation of a partnership, at the option of appellant, if the profits of such contracting in Pomona were sufficiently persuasive. The agreement also provides that if no one of the street contracts at Pomona is awarded to McIntyre, that contract should terminate at once at the option of said Peters, or that "it may be continued in force until a contract other than the Pomona contract is secured by McIntyre, satisfactory to said Peters, in which case the agreement, and conditions of this contract in relation to the Pomona contracts shall be in force as to the new contracts as far as they can be made to apply."

In pursuance of the agreement, McIntyre bid upon the Pomona contract and Peters advanced money in connection therewith, as required by said contract, one thousand four hundred dollars of which was in the form of certified check to be deposited with the bid as required by law. The agreement provided that Peters furnish three thousand five hundred dollars—two thousand one hundred dollars in addition to the certified check. This was done, and the two thousand dollars was used in Pomona. A part of it was used for the purchase of the equipment used at Pomona, and $450 was taken as the monthly salary of McIntyre. McIntyre failed to secure the Pomona contract, and the certified check was returned to Peters October 31, 1911, and, as the contract provided, the relation between the parties thereto might have been terminated at the option of Peters, but McIntyre later showed an intention to try to secure other contract work. On February 6,

1912, McIntyre wrote Peters from Ventura: "I have landed two contracts for two reservoirs. C. M. Miller and I are going to contract together. He has a great part of the necessary equipment," and asks for a draft of one thousand four hundred dollars. This was sent February 8th in a letter wherein Peters said: "This to apply on contract, same as the two thousand dollars sent you at Pomona." On February 11th McIntyre acknowledged receipt of the one thousand four hundred dollars "to apply on contract of October 9th," this being the preliminary written contract between Peters and McIntyre. He also sent an account showing $2,805 cash on hand, which, with $120 worth of equipment, three months' allowance to McIntyre of $450, and attorney's fees paid on the street contracts at Pomona, aggregated three thousand four hundred dollars, which was the total amount up to that time received from Peters, and added "In regard to the work here and our arrangement. The contracts are taken in the name of G. T. McIntyre and C. M. Miller. We will both give our time to the work and make an even split in the profits. When we get to going here there will be an abundance of this work." The next letter to Peters, eight months later, states: "I have been endeavoring to get things in such condition as would permit me to make some sort of statement to you in regard to my financial condition, but seemingly I have either been too busy or too tired to attempt the task. . . . My experience with Miller was very unsatisfactory. . . . I have finished my third job for the Del Norte Water Company and the engineer is now reconciling the account for this work. . . . At present, rather than giving you a detailed statement of expenses and receipts, it may be sufficient to say that I have almost a complete equipment for this sort of work—all sizes of pipe tools from 6 inch to 20 inch, concrete mixer, engine and pump for serving the yard with water or elevating the same to reservoir sites for construction, 36 foot sand elevator," etc., "and, when things are balanced, about $600 in the bank. This is a very poor financial showing when compared with the talk we had in Riverside nearly a year ago but to me it seems very good, having put my foot in it with Miller as I did on the start. . . . Will try and be more 'decent' in the future." The next letter from McIntyre to Peters was January 11, 1913, and stated: "I have endeavored for some months past to acquire time to give you an idea of what we are doing in Ven-

tura county. The little stake taken up in that country last
April has not done so well as we at first anticipated, but dur-
ing the season we have completed paying for an equipment
such as is necessary there, amounting to approximately $4000,
and have cash resources to more than clear the original stake
put into that section. It seems that it is impossible for me
to get time enough even to give myself an accounting, but
think this will be not altogether discouraging to you.'' Six
months later Peters pressed for further information, and on
June 14, 1913, wrote to McIntyre, stating: ''I have not heard
from you for a number of months as to how you are getting
along with the business. It is hardly business for me to allow
things to drift so without at least keeping in some touch with
matters. I wish you would send me a report of what you are
doing, what your assets are, what are the prospects and a gen-
eral account of things.'' January 17th McIntyre replied,
saying, among other things: ''I have frequently planned send-
ing you an intelligent statement of conditions here and always
put off for a time when an inventory could be taken and no
liability on hand. That time is now at hand. I am finishing
or have practically finished the work for the Del Norte Com-
pany and the individual owners. Have done considerable
business with fair results but not so good as I had hoped. I
will get to you a definite statement by Monday or Tuesday of
next week. At present I may say that roughly estimating I
have an equipment worth about $4000—up—may be more.
And when cement bills are cleaned up for this camp will have
about $1400 cash in bank. I am moving now on to a very
promising job.'' Then followed a statement of camp equip-
ment and reference is also made to a new job. ''It is a
$14,000 job. Will get you some definite matter by Tuesday
next. . . . I look for better results on the coming work.''
June 23, 1913, McIntyre writes saying it is impossible to get
off the promised statement. October 24, 1913, McIntyre writes
Peters inclosing a statement of the financial condition of the
business in Ventura County. He says: ''This showing is
probably not as good as I have desired but on the whole under
the conditions, it looks fair to me. Since we commenced
operation in that county it has seemingly been very difficult
to get a good organization. This you probably understand, as
you have the same conditions to deal with at times. . . . No
books have been kept. The segregated time sheets are filed

and bills are paid by voucher when possible, but a great deal of money has been spent almost promiscuously, and I feel that the loss has been very great. . . . I frequently think that I would like to see you and give you more information regarding the investment, but somehow when I get into town every moment is taken," etc. "I trust the statement will not be discouraging and will endeavor to send you an itemized list during the coming week." Then follows a statement in which is included the item of $1,706.71 due the plaintiff Lumber Company.

McIntyre, called as a witness, testified: "I made profits on the contracts which I have had since I signed this agreement with Mr. Peters, but there was no division of profits made between Mr. Peters and myself, and no statement or statements of profits were made to Mr. Peters other than the statements introduced in evidence. Mr. Peters and I never had a settlement with reference to the contracts. *I think that I had at times enough money to pay the debts incurred in the business carried on under my agreement with Mr. Peters.* I believe at that time I had enough money in the bank to meet such indebtedness, but I am not positive."

It is obvious from this correspondence that McIntyre never asked Peters to exercise his option to enter into the copartnership. Peters was unable during all this time to get any adequate statement from McIntyre as to the condition of his affairs. Under the contract Peters had a right to wait for the performance of some contract which, in substitution for the Pomona contracts, was to determine the question as to whether or not the business was profitable. McIntyre entered into a partnership agreement with Miller for the doing of the work and never made Peters any statement from which Peters could determine whether or not the business was profitable. The fact that Peters showed an interest in prospective contracts and apparently attempted to direct McIntyre's attention to possible contracts, in view of the written agreement between the parties and the investments already made by Peters, is of no significance. McIntyre never referred to Peters as a partner. He was transacting his business either in his own name or in the name of McIntyre & Miller. There is no evidence and no claim that Peters ever by any direct statement or agreement exercised the option given him to create a partnership. No partnership agreement was entered

into between them.   No adjustment of their rights under the
first contract was ever made.   In urging that there was a
partnership the plaintiff is in no better position than Mc-
Intyre.   The original agreement between the parties is ample
explanation for the connection of Peters with McIntyre, and
Peters was entitled to rely upon the fact as to third parties
that he was not being held out as a partner, and therefore was
justified in a continued effort to secure from McIntyre some
evidence that a partnership would be profitable to him.   One
other transaction between McIntyre and Peters requires notice.
In January, 1914, Mr. Peters went upon a contractor's bond
for McIntyre, amounting to five thousand dollars, and there-
after signed notes with McIntyre, but not in any firm name,
for four thousand dollars, for the purpose of financing the
contract covered by the bond.   Mr. Peters testified that he
consented to sign the bond solely upon the representation of
McIntyre that he would be able to finance the job without
any assistance from Peters.   A few days after the bond was
signed, however, McIntyre came to Peters, stating that he
could not finance the job, and asking that he sign the above-
mentioned notes, which was done.   Apparently the notes were
paid from the proceeds of the contract in question, with the
exception of $778.89.   Under the contract of October 9, 1911,
it was agreed that Peters should advance money for the pur-
chase of equipment and that that equipment should be pur-
chased in his name and be his property.   On December 24,
1914, Peters suggested to McIntyre a settlement of their
affairs, by the terms of which Peters was to convey all the
equipment to McIntyre and take a chattel mortgage back for
the three thousand four hundred dollars advanced and for the
$778.89 remaining due on the note that was signed by Peters,
making a total of $4,178.89.   Mr. McIntyre apparently acqui-
esced in the plan, but never carried it out.

In considering whether or not Peters ever exercised his
option to enter into a partnership with McIntyre under the
terms of the contract of October 9, 1911, other provisions of
that contract must be noted.   It was recited in that contract:

"Whereas McIntyre is desirous of engaging in the general
contracting business, particularly that of street paving and
cement contracting, and has not funds at his command to do
so, and desires to interest Peters in said business with him,
and said Peters wishes to engage in said business, if it is

proven to be profitable to him and the conditions of same are proven satisfactory to him, and whereas said McIntyre represents himself as a person skilled in the estimation and execution in an economical and profitable manner of such contracting work, and whereas said McIntyre has estimated on two street paving jobs now being opened to bids at Pomona, Calif., and desires to submit bids on same, now therefore in order to determine whether the said contracting business is profitable enough and satisfactory so as to appeal to said Peters as a permanent investment, the said parties agree with each other as follows.'' It was further agreed that the bids on the Pomona job should be made at a price that would net a profit of twenty per cent, namely, a profit of four thousand dollars. Peters was to advance three thousand five hundred dollars, three thousand one hundred dollars of which was to be used in the purchase of tools, ''said equipment to be bought in the name of and remain the property of said Peters.'' Arrangement was then made with reference to the disposition of the assets in the event that Peters did not desire to continue. But it was provided, among other things, that if Peters desired to continue in the contract business, he was to receive the entire net profits until half his investment had been repaid, whereupon the equipment was to belong to the copartnership. These profits were to be paid upon the completion of each contracting job. Books of accounts were to be kept. Peters was to have the deciding voice as to all matters until he had received sufficient profits to repay him half of his investment. McIntyre never called upon Peters to elect whether he should or should not go on with the business. No showing of sufficient profits was made to justify Peters in entering into a copartnership. No books were kept of the affairs of the alleged copartnership. In short, the situation seems to be simply this: Under a preliminary contract Peters advanced, as he agreed to do, three thousand four hundred dollars, which was, under the contract, to be employed in the purchase of equipment which thereafter belonged to Peters. McIntyre thereafter continued to use Peters' property, with meager and unsatisfactory reports of what he was doing, with no showing of profits and without requesting or suggesting or intimating to Peters that he should elect or had elected to be a partner. Peters in the meantime allowed McIntyre to continue to use his equipment, waiting with more or less patience the results

of McIntyre's work.   As between himself and the public, he had a right to rely upon the fact that he was not being held out as a partner, and as between McIntyre and himself he had a right to rely upon the fact that he never had elected to become a partner.

We therefore conclude that the finding that Peters was a partner of McIntyre is not sustained by the evidence.

The judgment against the defendant Peters is reversed

Sloss, J., Shaw, J., Lawlor, J., Lennon, J., and Angellotti, C. J., concurred.