[Civ. No 5342. Second Appellate District, Division One.—January 31, 1929.]

WEDGEWOOD NOWELL, Respondent, v. GEORGE W. OSWALD et al., Appellants.

[Civ. No. 6031. Second Appellate District, Division One.—January 31, 1929.]

WALTER G. MATHEWSON, Commissioner of the Bureau of Labor Statistics, etc., Respondent, v. GEORGE W. OSWALD et al., Appellants.

George L. Greer for Appellants.

Duke Stone, Chas. F. Lowy and Isaac Pelton for Respondents.

CRAIL, J., *pro tem.*—█ The sole question presented on appeal is the correctness of the trial court's decision that appellant Oswald was a joint adventurer with others in the production of a theatrical exhibition and therefore liable to employees for claims for labor. We are satisfied that the ruling of the trial court was correct. (*Westcott* v. *Gilman*, 170 Cal. 562 [Ann. Cas. 1916E, 437, 150 Pac. 777]; *Chapman* v. *Hughes*, 104 Cal. 302 [37 Pac. 1048, 38 Pac. 109]; *Leake* v. *City of Venice*, 50 Cal. App. 462 [190 Pac. 440].)

There is an all-important difference in construing relationships of this kind as between the parties themselves upon the one hand and as between the parties themselves and those who have dealt with them upon the other hand. In the instant case the rights of third parties are involved; and as stated in *Westcott* v. *Gilman, supra:* "When, however, the rights of third parties are involved, the basis of the inquiry shifts materially, and the fundamental questions are, what had those third parties the right to believe from the language of the contract and from the conduct of the parties to it as affecting them, and not as affecting each other. Each case, therefore, is adjudicated upon its own facts, and very little value will be found from any extended review of the authorities."

Oswald, Mrs. Small, and Castle entered into a contract under the terms of which Oswald, in consideration of a loan of $2,000 to Mrs. Small, was given an undivided one-half interest in the net proceeds to be derived from a show to be staged by Mrs. Small, known as "Mlle. Magnificent." No provision was made for the return of the money except that it was to be paid back from the gross proceeds derived from the show before a division of the profits. It was further

agreed that in no way was Oswald to be held responsible for any debts incurred in said production. No mention is made of Castle in the contract except that he also was not to be held responsible for any debts and that he "is acting solely as trustee" for Oswald. We must go to another contract made at the same time to ascertain how Castle is to "act" as trustee. In this contract, entered into between Mrs. Small and Castle, it is agreed that Castle is to be known at all times as director of the production and is to dictate policies and performances at all times without interference from Mrs. Small; also that he shall act as treasurer and that he shall have sole and exclusive charge of all matters relating to advertising and exploitation. Disbursement of all moneys is to be done only by signature of D. Castle, trustee, and all moneys accruing from the production will be deposited in the name of D. Castle, trustee. The net profits were to be divided as follows: fifty per cent to Oswald, fifteen per cent to an actor named Ricker for services in lieu of salary, ten per cent to publicity, fifteen per cent to Castle, and only ten per cent to Mrs. Small. It was stipulated in an agreed statement of facts that each of the defendants Oswald, Mrs. Small, and Castle knew that plaintiff's assigns were rendering the services of actor, pay for which the action is brought, at all times during the said performance. They could only know this fact at all times by being on hand at all times when the services were rendered.

This was not a loan, in the ordinary sense, for the money was to be paid back, not by Mrs. Small, but from the gross proceeds of the venture. It is apparent also that while Castle was called "Trustee," he was in fact the agent of Oswald. Except as to the moneys which were deposited in the bank, he had none of the attributes of a trustee, but was the general agent of Oswald in putting on the production. Oswald was in charge of the show at all times, through his agent, who was director of production, dictator of policies and performances, as well as sole and exclusive manager of all advertising and exploitation. Furthermore, appellant was given the option for a period of ninety days "to stage the show elsewhere" and, since the terms upon which he was to stage it elsewhere were not stated, it is a fair inference that in the event he exercised the option he was to stage

it on the same terms as those of the original contract under which he *staged* it at the Mason Opera House.

The cases relied upon by appellant may be readily distinguished from the instant case. The contracts in those cases showed clearly a *bona fide* effort to lend money without any right whatever to conduct the business. In the instant case the contracts are so peculiar in phraseology and so unusual in their terms that third persons with rights involved manifestly see in them a deliberate attempt by one partner to evade his legal liability for the partnership debts—debts which were incurred during the performances in the personal presence of that partner at all times.

Section 2395 of the Civil Code defines a partnership to be "the association of two or more persons, for the purpose of carrying on business together, and dividing the profits between them." Appellant had power under the arrangement through his agent to make contracts, incur liability and manage the whole business. He enjoyed for a brief season the pleasures and distinction of being the angel of the show. Now that the show has flopped and eighty-six members of the cast are pressing for collection their claims for labor, he seeks to hide behind the skirts of the partner who was to receive only ten per cent of the net profits. We have said before that we believe the ruling of the trial court was correct.

Judgments affirmed.

York, J., concurred.

HOUSER, J., Dissenting.—It appears that no evidence was introduced on the trial of the case, but it was submitted to the trial court on an agreed statement of facts. It is to such statement only, therefore, that this court must look as a guide to a proper declaration of the law in the premises. In order that no misapprehension may occur as to the *facts* which were before the trial court and upon which the law of the case depends, they are inserted herein in full, as follows:

"First: That the parties mentioned in plaintiff's complaint performed services of the kind and value as set out in the complaint in the production of a show at the Mason

540

Opera House in the City of Los Angeles, California, entitled 'Mlle. Magnificent.'

"Second: That prior to the institution of this action, said parties assigned unto the plaintiff herein the said claims.

"Third: That said production was actually given as a public exhibition at said Mason Opera House in the City of Los Angeles, California.

"Fourth: That prior to the giving of said exhibition or production the defendants, D. Castle and Mrs. Ann Small, entered into an agreement dated June 18, 1924, a copy of which is attached hereto as Exhibit 'A'; and that Ann Small mentioned in said exhibit is one and the same person as Mrs. J. A. Small, the defendant herein.

"Fifth: That prior to said production, to-wit: on June 18, 1924, George H. Oswald, Mrs. Ann Small and D. Castle entered into a contract in writing, a copy of which is hereto attached as Exhibit 'B.'

"Sixth: That each of the defendants knew that the said parties whose claims were assigned to plaintiff herein were rendering the services as actors at all times during said performance, but without admitting the materiality of any of the facts above stated.

"Exhibit 'A.'

"Agreement.

" 'This agreement, made and entered into this 18th day of June, 1924, by and between D. Castle, party of the first part; Mrs. Ann Small, party of the second part:

" 'Witnesseth:

" 'Whereas the parties of the first and second parts have prepared for public presentation a legitimate production entitled "Mlle. Magnificent," to be staged in the City of Los Angeles, State of California, on or before the 30th day of June, 1924.

" 'The party of the first part is to be known at all times as director of this production and is to dictate at all times policies and performances of said production without interference from party of the second part.

" 'It is understood and agreed by and between both parties that the disbursement of all moneys is to be done only by the signature of D. Castle, Trustee.

" 'It is further understood that all moneys accruing from the production, including gate receipts, advertising, programs or any other source pertaining to said production, will be deposited in the United States National Bank, in the city of Los Angeles, Calif., in the name of D. Castle, Trustee.

" 'It is further agreed by both parties that upon completion of said production and after paying all expenses attendant thereto, an audit will be made of all accounts and books and the balance of moneys remaining in said account shall be disbursed as follows:

" 'Geo. H. Oswald shall receive the sum equal to fifty per cent of the net profits of the above mentioned production for moneys advanced; David Swing Ricker shall receive the sum equal to fifteen per cent of the net profits for services rendered and in lieu of salary; Soldiers' Monument Fund shall receive the sum equal to ten per cent of the net profits; D. Castle, party of the first part, shall receive the sum equal to fifteen per cent of the net profits, and the balance of ten per cent shall go to Mrs. Ann Small, party of the second part.

" 'Party of the first part shall act as treasurer during the entire production; and shall have sole and exclusive charge of all matters relating to the advertising and exploitation of said production.

" 'In Witness Whereof, the parties have set their hands and seals at the City of Los Angeles, State of California, the day herein first above written.

" '(Sgd) D. CASTLE
" '(Sgd) MRS. ANN SMALL.'

"Exhibit 'B'

"Agreement

" 'It is hereby agreed, by and between the parties hereto that Geo. H. Oswald, party of the first part, and Mrs. Ann Small, party of the second part, and D. Castle, party of the third part. That for and in consideration of the loan of the sum of Two Thousand Dollars ($2,000.00) to be made by the party of the first part to the party of the second part, that the party of the first part is hereby given an undivided one half (50%) interest in the net proceeds to be derived from a show to be staged by the party of the second part, known as Mlle. Magnificent, to be shown at the Mason Opera

House, in the City of Los Angeles, Calif., beginning June 25th, 1924.

" 'It is further agreed by and between the parties hereto, that this loan above mentioned, is to be paid back to the party of the first part from the gross proceeds derived from this show out of the receipts of the first night's performance. And if the gross receipts of the first night's performance do not equal the amount of this loan, then the same procedure to carry on for the balance of the nights said show is shown until this loan is paid in full.

" 'It is further understood and agreed upon that in no way is the party of the first part to be held responsible for any debts incurred by the party of the second part in the production of this show in any way, and the party of the third part, it is agreed, shall also not be held responsible for any debts incurred by the party of the second part, it being further agreed and understood that party of the third part is acting solely as trustee for party of the first part.

" 'It is further agreed by and between the parties hereto that the party of the first part is hereby given an option for a period of ninety (90) days to stage this show elsewhere, if he so desires for the same consideration above mentioned.

" 'It is further agreed that the paying back of this loan as above outlined does in no way affect the undivided one half (50%) interest of the party of the first part in the profits of said show.

" 'This Agreement Made and Entered into this 18th day of June, 1924.

" ' (Sgd) GEO. H. OSWALD
" ' (Sgd) MRS. ANN SMALL
" ' (Sgd) D. CASTLE.' "

From Exhibit "A," which is the agreement in which *D. Castle and Mrs. Small are the only parties,* it appears that *they* "have prepared for public presentation a legitimate production," of which Castle is to be the "director"; that he is "to dictate at all times policies and performances of said production; . . . have exclusive charge of all matters relating to the advertising and exploitation of production"; receive all moneys accruing therefrom, which will be not only banked, but as well disbursed, in his name, only, as trustee; and that of the net profits (if any) Oswald shall receive fifty per cent *"for moneys advanced,"* Castle fifteen

per cent, Mrs. Small ten per cent, Ricker fifteen per cent and Soldiers' Monument Fund ten per cent.

By Exhibit "B," which is the agreement in which Oswald is a party, together with Castle and Small, in substance it is provided that in consideration of a loan of $2,000 made by Oswald to *Small*, for a possible period of ninety days Oswald may receive fifty per cent of the *net profits* of the "show"; that Oswald is to be paid back his $2,000 from the *gross* proceeds derived from the enterprise; and that neither Oswald nor Castle is to be held responsible for any debts incurred by *Small* in the production of the "show." Also, that Castle "is acting solely as trustee" for Oswald.

As a further condensation of the two agreements, it may be said that Small and Castle formed an association for the purpose of producing a "show," to be managed by Castle "without interference" from Small; that of the *gross* proceeds from the production Oswald was to be first paid the $2,000 which he had lent to *Small*, and thereafter any profits which might be derived from the operation of the "show" were to be divided among the several parties to the two agreements, Ricker, and Soldiers' Monument Fund.

So far as appears on the face of the instrument, Oswald *was a stranger to the agreement between Castle and Small.* Not having signed that agreement, he was in no way bound by its provisions. Although by the terms of that instrument Oswald was to receive fifty per cent of the net profits of the production "for moneys advanced," it will be noted that in the agreement in which Oswald's name *does* appear as a party thereto (and which was the only instrument by which he was expressly bound), it is recited that the loan was made not to Castle *and Small,* but that the loan was to be made to *Small* personally. Nor does that agreement contain even the slightest intimation or indication of the purpose of the loan, or the use to which it was to be put. For aught that appears, the money so lent to Small might be used by her, not necessarily in the "legitimate production of Mlle. Magnificent," but might be used by her to buy real estate, or to engage in any other "legitimate" or illegitimate business, dependent solely either upon her best judgment or her caprice. In such circumstances, merely because, in addition thereto, according to the statement of facts of the parties to the litigation, Castle was "acting solely as trustee"

544

for Oswald, and Oswald "knew that the said parties whose claims were assigned to plaintiff herein were rendering the services as actors at all times during the performances,"—to hold that Oswald was a partner in the business and consequently liable for the debts of the partnership in my opinion is not consonant with the law as announced in authorities to be hereinafter cited. None of the persons whose claims formed the foundation of the action rendered services or furnished materials to the partnership upon any representation made to him by Oswald, or by any other person, that Oswald was a member of the association; nor did any of such persons even believe that Oswald was in any way connected with the business. In other words, credit was not extended on the basis that Oswald was a member of the partnership. Reduced to its lowest terms, the agreement simply shows that Oswald lent money to a woman who was engaged in the "show" business. His money was to be paid back to him in any event from the gross receipts of that business, and if there were any profits from the management thereof he was to receive a certain percentage thereof (whether fifty per cent or one-fourth of one per cent is of no materiality so far as the legal principle involved is concerned). But Oswald's stipulation with the woman was practically that he was not to be liable for any debts that might accrue. Apparently he had nothing to do with the business other than that Castle was to act as "trustee" in the matter of seeing that the business was properly managed and that an accurate accounting was had, first, as to the "*gross proceeds*" from which the $2,000 loaned to Small was to be repaid to Oswald; and, secondly, in determining the amount of interest (if any) to be paid to Oswald by way of "net profits."

By section 2395 of the Civil Code, in order to constitute a partnership between two persons, it is essential that they associate themselves "for the purpose of carrying on business together." Nowhere, even in the *two* agreements herein considered as a whole, much less in the agreement to which Oswald subscribed his name, may the least indication be found that Oswald was associating himself with Castle and Small, or with either of them, "for the purpose of carrying on business together" with either or both of them.

The cases of *People's Lumber Co.* v. *McIntyre & Peters*, 179 Cal. 780 [178 Pac. 954], and *Martin* v. *Sharp & Fellows C. Co.*, 34 Cal. App. 584 [168 Pac. 373], are at once illuminating and determinative of the principle here involved. In the former case, although the contract between the parties thereto does not appear in the body of the opinion, from the transcript on appeal, among other things, it appears that one McIntyre, who desired to engage in the general contracting business, especially in the paving of streets, induced a man named Peters to lend him $3,500 with which "to provide the necessary tools and equipment needed to economically do said work, and for other expenses; . . . said money to be expended jointly by both said parties in purchasing the said equipment; . . . said equipment is to be bought in the name of and remain the property of said Peters, except as otherwise provided hereinafter." McIntyre was to be paid a stipulated salary, "whether the contracts be proven to be profitable or not." The contract further provided that: "If said Peters does not regard the contracting business as sufficiently profitable to induce him *to continue* therein, or if for any other reason he desires to *discontinue* same, *then the net profits shall be divided in two equal portions, Peters receiving half and McIntyre receiving the other half.* If the net profits, not counting in McIntyre's wages as a part of the expenses, amount to a sufficient amount that his one-half share of net profits is more than his total wages at $150 per month, then in that event McIntyre shall not be entitled to any wages, but the one-half of the net profits shall be his only compensation, but if his one-half share of the net profits amounts to less than his total wages, then he is to receive his total wages only and no share of the profits. *Peters shall receive the entire remainder of the net profits in any event. . . .*" McIntyre was then given the right to purchase the equipment from Peters. The contract further provided that if Peters should "desire to *continue* the contracting business, *then the profits shall not be divided as above, but the total net profits* (counting in McIntyre's wages as a part of the expenses) *shall be payable to said Peters* on the completion of said contracts, said McIntyre receiving only his wages at $150 per month, as full compensation, together with the other considerations hereinafter named." If a "partnership" should thereafter

be formed, "in conducting said business, thereafter, after each contracting job shall have been completed, *the net profits thereon shall be paid to said Peters solely, until he shall have had returned to him an amount equal to one-half of his total investment in said company.*" To put the matter otherwise, as stated in the course of the opinion rendered by the supreme court in the case of *People's Lumber Co.* v. *McIntyre & Peters:* "It was provided, among other things, that if Peters desired to *continue* in the contract business, *he was to receive the entire net profits until half his investment had been repaid,* whereupon the equipment was to belong to the copartnership. . . . " Thereafter a general contracting business was carried on by McIntyre, sometimes individually and at other times in association with a third party, but always with the understanding *that Peters was to share equally with McIntyre in the net profits.* In the course of business a debt was incurred on account of materials furnished by People's Lumber Company to McIntyre upon which an action was brought against McIntyre and Peters *on the theory that Peters was a partner in the business,* and which action resulted in a judgment against both McIntyre and Peters, from which an appeal was taken. The supreme court reversed the judgment, holding that the finding by the lower court that Peters was a partner of McIntyre was not sustained by the evidence. It is most apparent that the facts in that case, compared with those in the instant case, are strikingly similar. As a single illustration, in addition to what hereinbefore has been set forth, as remarked by the supreme court at the outset of its opinion: "At the time of the contract between the plaintiff and McIntyre *the plaintiff had never heard of the alleged partnership, and its claim is therefore not based upon the theory of an ostensible partnership, but upon the character of the actual agreement between Peters and McIntyre.*" Considering the effect of the relationship between Peters and McIntyre, in part it was said: "In urging that there was a partnership the *plaintiff* is in no better position than *McIntyre.* The original agreement between the parties is ample explanation for the connection of Peters with McIntyre, and *Peters was entitled to rely upon the fact as to third parties* that he was not being held out as a partner, . . . *As between himself and the public, he had a right to rely upon the fact that he*

*was not being held out as a partner*, and as between Mc-Intyre and himself he had a right to rely upon the fact that he never had elected to become a partner."

The doctrine announced in the case of *Martin* v. *Sharp & Fellows C. Co.*, 34 Cal. App. 584 [168 Pac. 373], is equally disastrous so far as respondent's position is concerned. In brief, it there appeared that the person sought to be held as a partner leased certain mules to a general contractor and "agreed to *advance to him such moneys as he might require in the early prosecution of the work* and until he received instalments of his contract price, due at intervals upon estimates of work done in the progress thereof, in consideration of which John Mulligan (the lender of the money) *was to have one-half of the net profits derived from the contract.*" Later, the lender of the money to the contractor agreed that "any balance that may be due after all bills incurred by this contract (so made by plaintiff with defendant) have been liquidated, *is to be divided equally between the parties to this agreement, and any deficiency liquidated equally by the parties hereto.*" The judgment of the court was to the effect that no partnership existed between the parties. In the course of the opinion it is said:

"By section 2395 of the Civil Code, a partnership is defined to be 'the association of two or more persons, for the purpose of carrying on business together, and dividing its profits between them.' Under this definition, a mere participation in profit and loss does not necessarily constitute a partnership, for, as said in *Dwinel* v. *Stone*, 30 Me. 384, 'there must be such a community of interest as empowers each party to make contracts, incur liabilities, manage the whole business, . . . a right which, upon the dissolution of the partnership by death of one, passes to the survivor, and not to the representatives of the deceased.' To like effect are *Coward* v. *Clanton*, 122 Cal. 451 [55 Pac. 147], *Vanderhurst* v. *De Witt*, 95 Cal. 57 [20 L. R. A. 595, 30 Pac. 94], and *Nofsinger* v. *Goldman*, 122 Cal. 609 [55 Pac. 425], in the former of which it is said that *profit sharing* is not the true test of partnership. The association must be for the purpose of *jointly carrying on the business*. Mulligan was not interested in the conduct of the business, except in so far as it affected the profits, one-half of which he was to receive for the use of the money, not advanced to the partner-

ship but *loaned to Martin.* . . . The doctrine of equitable estoppel, which appellant seeks to invoke, finds no support in the record, which is barren of any evidence of representations or acts on the part of plaintiff calculated to lead defendant to believe that such partnership existed.''

In the majority opinion herein certain authorities are cited in support of the judgment. Without reviewing them or attempting to distinguish or to analyze them, I must content myself with the statement that I am unable to perceive their application to the situation here involved. If the principle of law for which respondent contends is sound, a banker who may lend money to a merchant on the condition that the principal and the interest thereon are to be repaid from the gross sales and profits of the business of the merchant, and, as is often the case, where, for the purpose of insuring fair dealing to the banker or proper management of the business, the banker places a representative in the business of the merchant—the banker becomes a partner in the business and is liable as such, notwithstanding the further fact that persons who deal with the merchant and extend credit to him do so without either knowledge or belief as to the banker's connection with the business of the merchant. Relying upon the authorities to which attention has been directed, together with the cases therein cited, I am led to the conclusion that the judgments herein, so far as appellant Oswald is concerned, should be reversed; but that as to defendant Castle the judgments should be affirmed.

A petition for a rehearing of these causes was denied by the district court of appeal on February 20, 1929, and petitions by appellants to have these causes heard in the supreme court, after judgment in the district court of appeal, were denied by the supreme court on April 1, 1929.