[Civ. No. 18746. Second Dist., Div. Two. Nov. 17, 1952.]

B. J. WALLACE, Respondent, v. G. S. SINCLAIR Appellant.

222

James L. Patten and J. A. Leetham for Appellant.

Clock, Waestman & Clock and Henry H. Clock for Respondent.

MOORE, P. J.—Defendant appeals from a judgment dissolving a limited partnership and decreeing that its assets be sold and distributed in equal shares to the partners after payment of partnership liabilities and expenses of sale.

By written articles on December 28, 1943, the parties agreed to engage in the partnership for the purpose of buying and selling alcoholic beverages, catering and sale of food and meals to the general public and the purchase and lease of real and personal property. Commencing January 1, 1944, the partnership operated 10 stores and cafés in the southern

portion of Los Angeles County. The enterprise proceeded profitably and agreeably until the middle of 1949. Thereafter it continuously lost money. The volume of sales in their stores, saloons and cafés greatly decreased and the volume of partnership business dropped substantially. As a result of the decline in sales volume, the partnership operated at a loss and its capital assets became reduced. Despite the decline in volume of business and profits and the reduction of partnership assets, appellant as general partner continued to draw his $750 per month salary and maintained approximately the same percentage of general expense in its ratio to net sales. As a result of such policy, the partnership operated at a loss after the middle of 1949.

On respondent's demand for a termination and dissolution of the partnership and determination and liquidation of the assets, appellant refused compliance, took the position that he was the injured man and resolved upon terminating the partnership. In response to a supplemental complaint, the court found that after the filing of the original complaint, appellant carried on a course of conduct in violation of the partnership agreement and conducted himself in violation of certain provisions of section 15032 of the Corporations Code, hereinafter quoted, in this, to wit: defendant served on plaintiff a purported notice of dissolution based upon a violation of section 54 of the A. B. C. Act[1]; gave notice to the Board of Equalization that the partnership had been terminated and that respondent was no longer interested in its affairs; notified other agencies that respondent was no longer a member of the firm; attempted to coerce respondent to sell his partnership interest to appellant on the basis of the cost value and refused to give respondent a statement of profit and loss. From which the court concluded that as a result thereof appellant breached the partnership agreement and it is not reasonably practicable for the partnership to be carried on by the parties.

About 1941 appellant established a business with Carl Wallace, brother of respondent, which was a limited partnership. When the matter was presented to the liquor control officer, it was determined that since Carl was vice president of a wholesale liquor corporation, his partnership with ap-

---

[1]A. B. C. refers to the Alcoholic Beverage Control Act, Statutes 1935, p. 1123, and subsequent amendments to 1949. Section 54 of the act makes it a crime for a wholesaler or his agent to own any interest in the business of an on-sale licensee.

pellant was a violation of section 54 of the A. B. C. Act which makes it unlawful for an officer of a wholesale liquor company to own an interest in a retail liquor business. Pursuant to such decision, Carl's interest was sold and transferred to respondent who was an employee of Carl's corporation, to wit: Home Ice and Cold Storage Company, herein referred to as Home Ice. With such interest appraised at $54,480.53, the new limited partnership commenced operations with a capital of substantially $109,000 with appellant as a general partner and respondent as the limited partner. Each was to share equally in the profits and losses, but appellant was to have sole charge and reasonable compensation therefor. Respondent was to have no part in the management. While the agreement provided for termination of the partnership January 1, 1959, unless terminated by dissolution at an earlier date, it provided also: (1) the partnership should become dissolved on the happening of any event which is specified by law as a cause of dissolution of a general partnership; (2) if dissolution should be caused by the misconduct of a partner, then at any time before the business be completely wound up, the innocent partner may purchase the other's interest after notice to the offending partner on the basis of a formula set out in the agreement; (3) upon the giving of such notice by the innocent partner, he shall be deemed to have become the purchaser and owner of the retired partner's interests in the partnership assets; (4) thereupon he shall be entitled to possession of such assets and good will of the partnership, free of any claim on the part of the retired partner except to receive the purchase price.

Prior to the commencement of the instant action the parties conducted some negotiations for a settlement. Respondent complained of the way the business was going and insisted that appellant sell the units that were losing money. In March, 1950, respondent made appellant a written offer to sell his share for $75,000 or to buy appellant's share for the same price. Such offer was rejected along with appellant's offer to pay respondent the book value ($60,000) of the latter's interest or to sell his own share to respondent for $85,000. Following a rejection of appellant's offer, respondent filed suit.

### EVIDENCE SUFFICIENT

As grounds for reversal, appellant contends first that the evidence is insufficient to justify a dissolution of the partner-

ship. Appellant testified to the net loss of $3,268.40 in 1949, $3,672.60 in 1950. Appellant's accountant, Mr. Leach, testified the business operations for 1949 suffered a loss of $6,849.03 which was cured to some extent by two long term capital gains aggregating $3,580.63; the operating loss for the first 11 months of 1950 was $11,372, while a gross profit was earned in December in the sum of $1,659.81, from which appellant's salary of $750 was deductible. Appellant testified that for the five months following November, 1950, the business operated at a loss. Respondent testified that the costs of operations caused a loss because of changed conditions; the firm had not kept up with its competitors in respect to attractions or display advertisements, and retained no competent salesmen who could make suggestions of other items as is done by competitors.

From Mr. Leach's testimony, the net worth of the partnership at the end of six specified years was as follows:

| | |
|---|---|
| 1945 | $156,000 |
| 1946 | 148,000 |
| 1947 | 139,000 |
| 1948 | 142,000 |
| 1949 | 122,000 |
| 1950 | 119,000 |

From that proof the inference is unavoidable that the assets of the partnership declined 23 per cent in five years; over 16 per cent in the two years preceding January 1, 1950, and the net value of the business reached the nadir of its career by April 30, 1951. What more is required to demonstrate the truth of the finding that the business can be operated only at a loss with its present constituent units, its same salesmen and with the manager who directed it during those five fateful years? Should deterioration continue at the same speed, nothing but the corpses of the participants could be found at the close of the period fixed by the partnership agreement.

The courses of some of the units taken separately are calculated, and they justify the implied finding that appellant's genius for management is not likely to restore harmony or to increase the chances for material gain. In September, 1949, the Blue Door (liquor store, bar and café) made a profit of $337.40, and for October it made $135.34. Thereafter it lost each month until April 1, 1950, aggregating a loss of

$1,903.07. For eight months in 1949 the Blue Door suffered a net loss of $1,100 and for 11 months in 1950, $900. While the liquor store made a profit throughout 1949 and in ten months of 1950, the *café and bar* lost every month in 1949 except September and in every month of 1950 except August and November. The café and bar lost every month in 1949, except September and all of 1950 except September and October. While appellant testified that the operating loss of the Blue Door was caused by the closing of the Anaheim street bridge, the proof shows that the Blue Door as a whole suffered a net loss for six months prior to the closing of the bridge. In the cases of the Rancho Liquor Store, the Schuyler Bar and the Club Café, appellant gave plausible excuses for the diminution of receipts. It was either roadwork on the highway, disappearance of military activity, lack of "general business" or price competition. The glaring fact established as to the four mentioned units is that they were steadily losing money. Appellant testified that the Club Café and Bar operated at a loss for a year and a half and that such trend continued from October 18, 1950, to the time of trial, May 24, 1951.

During the first five years of the partnership, each partner received as his share of the profits in excess of $37,000. No revenues were available after September, 1949. By reason of the generous returns on respondent's investment, appellant contends that respondent has no right to complain of the dearth of gain; that the latter had earned sufficient; that he should be happy to be quiet for a while until the business potential can be captured and payment of dividends can be resumed. It is not within the right of appellant to direct the course to be pursued by respondent. The latter received his share of the earnings during prosperous years. Under the agreement he was entitled to them. They became a part of his own reserves. He is as much entitled to a dissolution of the partnership now on proof that "the business . . . can only be carried on at a loss and further continuance will greatly diminish and further destroy his share of the partnership assets" as he would have been at the close of the first year without having received any dividend on his investment.

That the court was warranted in making the finding last quoted is further evidenced by the ratio of the operating profit to net sales, as testified by Mr. Leach. In 1945 it was 18.67 per cent; in 1946 it was 10.72 per cent; in 1947 it was 2.6 per cent; in 1948 it was 4.8 per cent; in 1949 it was minus

.88 per cent; in 1950 it was minus 2.97 per cent. The relation of the operating expense to the operating receipts[2] shows that in 1945 the operating expense was 6.8 per cent of the gross receipts; in 1946, 6.6 per cent; in 1947, 7.9 per cent; in 1948, 5.9 per cent; in 1949, 5.7 per cent, and in 11 months of 1950, 5.8 per cent.

The effect of the proof of the practices of appellant as operator of the partnership business on the trial judge appears to have been aggravated by appellant's ignorance of details. He did not know whether the cost of maintenance of the burglar alarm exceeded the cost of insurance; whether a résumé of the cost of operations was correct; whether the figures testified to by Mr. Leach included the overhead charge at the Bank Café. Neither did he know the value of the realty or of the liquor licenses owned by the firm, the proximate amount invested in the Schuyler Café or the sum of its original investment or how long it had been unprofitable. Nor did he know the value of an on-sale or an off-sale license. Coupled with a view of the toboggan slide of the business during the past three years preceding the commencement of the action, such ignorance and lack of interest on the part of the general manager must have convinced the court that the business would probably continue to be operated at a loss.

Appellant argues that the only evidence on the question whether the business could only be carried on at a loss was his own testimony and that was that "all units are operating at a profit with the exception of two." However, the profit and loss statements received in evidence show that only three made profit while seven suffered a loss.

Notwithstanding the contradictory evidence received on behalf of appellant, the foregoing discloses the presence in the record of substantial proof in support of the findings. After the reviewing court has reached the determination that the evidence favorable to the findings is substantial, its investigation of the adequacy of such proof is at an end and it cannot substitute its deductions for the inference rea-

---

[2]Gross receipts, expenses including the $9,000 salary and per cent of gross income for operating expenses.

| Year | Gross receipts | Expenses | Per cent |
|------|------|------|------|
| 1945 | $661,000 | $45,000 | 6.8 |
| 1946 | 469,000 | 31,000 | 6.6 |
| 1947 | 392,000 | 31,125.11 | 7.9 |
| 1948 | 420,000 | 25,750 | 5.9 |
| 1949 | 371,000 | 21,750 | 5.7 |
| 1950 | 310,000 | 18,600 | 5.8 |

sonably drawn by the trial court. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183] ; *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689] ; *Southern California Iron & Steel Co.* v. *Amalgamated Assn. of Iron, Steel & Tin Workers*, 186 Cal. 604, 618 [200 P. 1].)  ▇  All reasonable inferences must be viewed in the light of the findings. (*Tyson* v. *Romey*, 88 Cal.App.2d 752, 755 [199 P.2d 721].)

▇  In addition to the finding that appellant has not conducted the partnership business with reasonable diligence and good judgment, the court determined also that appellant's service of a notice of dissolution on respondent, his similar notices to other agencies, his attempt to coerce respondent to sell his interest to appellant, and his refusal to furnish respondent with profit and loss statements warrant the conclusion that the "partnership business and affairs can only be successfully carried on in an atmosphere of cooperation and harmony, and under the existing conditions, said business cannot be carried on for the mutual benefit of the partners." Such findings were based upon admissions of appellant despite his claim that he terminated the partnership by reason of the acts of respondent who "made it impossible for the partnership business to be successfully carried on in an atmosphere of harmony." Such admissions were supplemented by appellant's testimony in respect to each admission. By virtue of the last mentioned findings and the doctrine of the limitations upon the power of a reviewing court to disturb a finding based upon substantial evidence, the misconduct of appellant was established.

▇  Where bitter and antagonistic feeling between partners has developed to the point that the partners cannot continue the partnership to their mutual advantage and both give notice terminating the partnership, a dissolution thereof is the equitable solution of an ugly situation and should be decreed. (*Owen* v. *Cohen*, 19 Cal.2d 147, 152 [119 P.2d 713] ; Corp. Code, § 15032(1) c, d, e, f.)  ▇  The cited code section is a mandatory direction to the chancellor. The "court shall decree a dissolution whenever: . . . (c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business, (d) or . . . so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him, (e) The business of the partnership can only be carried on at a loss, (f) Other circumstances render a dissolution equitable." By virtue of

the statute and the facts found, the denial of a dissolution would have been a denial of justice.

## WAS RESPONDENT AN AGENT OF HOME ICE?

Appellant has met the arguments adduced in favor of the judgment with rare cunning, but also he has carried the war into Africa and demands a reversal by reason of his thesis that respondent was at all times the agent of a liquor wholesaler in violation of section 54 of the A. B. C. Act. One finding in substance is that while respondent has held the title of manager of the Beverage Department and manager of the Long Beach plant, he has never been an agent, officer or director of that corporation at any time since the partnership began. Another finding is that the sales manager or manager of the liquor department of Home Ice is not an officer or agent within the meaning of section 54 of the A. B. C. Act. Appellant insists that there is no evidence to support such findings. He argues that (1) while respondent had his interest in the retail partnership he became an agent of Home Ice; (2) because of such simultaneous agency and ownership, respondent is at fault, his hands are unclean and he has no standing in equity. A listing of the evidence on both sides of such issue and all the statutes and decisions cited in support of both contentions would avail nothing. The court made the cited findings on that issue and substantial proof was presented upon the question as to whether the facts establish respondent to have been an agent of Home Ice. While the word "agent" is used in section 54 it is not defined there or in section 22 of article XX of the Constitution which makes provision for the licensing and regulating of the manufacture, sale and possession of intoxicating liquor. It is therefore necessary to consult statutes other than 54, 54.5 and 54.6 to ascertain the significance of "agent."

Agency is the relation that results from the act of one person, called the principal, who authorizes another, called the agent, to conduct one or more transactions with one or more third persons and to exercise a degree of discretion in effecting the purpose of the principal. The heart of agency is expressed in the ancient maxim: "*Qui facit per alium facit per se.*" (See 2 C.J.S. 1023.) The extent of the agency is measured by the authority conferred upon the agent, actually or ostensibly and his power is sufficient to do everything that is necessary, proper or usual to accomplish the purpose of the principal. (Civ. Code, §§ 2315, 2316, 2317,

2318, 2319, 2320, 2330.) ▮ The agent has actual authority defined by section 2316 unless limited by the principal, and his ostensible authority is unlimited except as to those persons having knowledge of the restrictions imposed upon the agency (§ 2318). ▮ In brief, an agent can act in the place of his principal while an employee may act only for his employer. (2 Cal.Jur.2d, p. 653; *People* v. *Treadwell,* 69 Cal. 226, 236 [10 P. 502]; *Crossin* v. *Elysian Springs Water Co.,* 105 Cal.App. 449, 454 [287 P. 985].) ▮ In the light of such authorities, respondent was an employee, not an agent of Home Ice. He had none of the authority of a general manager of that corporation. (See 6A Cal.Jur., p. 1156, § 656.) Since an agent's employment is primarily to effect a business relationship between his principal and another (2 C. J. Agencies, § 1, subd. c) and inasmuch as respondent's labors were confined to the drudgery of the sales department, he was a servant (Lab. Code, § 3000; *Sumner* v. *Nevin,* 4 Cal.App. 347, 350 [87 P. 1105]) and therefore the finding that he was not an agent is not arbitrary or unreasonable. Respondent testified that he had no power to make contracts on behalf of Home Ice, to borrow money, to execute a lease, to extend credit; that he had never been an officer or authorized to do a particular act for the corporation; that his duties at Home Ice at the commencement of the partnership were substantially the same on November 30, 1950, and that such duties remained the same until the time of trial, May, 1951. His routine for a day's work was (1) to check the garage for troubles there; (2) check the salesmen with respect to their complaints or reports; (3) check the reports of the previous day for any unsatisfactory work; (4) circulate around the plant to see that it was in good order. Ninety-five per cent of his time was consumed by his work within the office of the Long Beach branch of the wholesaler which did only 15 per cent of the total business. Less than five per cent of his time was devoted to dealing with third persons. The testimony was that the board of directors of Home Ice never authorized him to represent it in any capacity. He looked after the trucking and ice men and the company's salesmen and as an assistant salesmanager was paid a salary. From the evidence the court found that respondent was not an officer or agent of Home Ice. Whether he was an agent of the corporation was a question of fact. The court properly received much testimony relating to that matter. The finding upon that issue is

binding upon the reviewing court. (*Eldridge* v. *Mowry*, 24 Cal.App. 183, 188 [140 P. 978].) ▮ Where the extent of an employee's authority is not clearly defined by a writing or when such a writing is ambiguous, testimony will be received for the purpose of deriving a determination as to whether the employee was servant or agent. (*Starr Piano Co.* v. *Martin*, 119 Cal.App. 642, 648 [7 P.2d 383].) ▮ The fact that he was referred to as the "Assistant Sales Manager" was not determinative of his actual status. (*Nowell* v. *Oswald*, 96 Cal.App. 536, 537 [274 P. 423].)

### OTHER ISSUES

▮ Appellant asserts that the action was not commenced in good faith; that during five years of the partnership respondent received as dividends three times his original investment; that with eight years remaining he offered to sell his interest to appellant for $75,000; that at the time of respondent's demand for a dissolution the assets were worth $193,000; that therefore, his demand was inequitable and should have been dismissed by the court.

There was nothing inequitable in respondent's demand. He was taken into a going business on the promise that he should receive one half of the net profits as they accrued. When he discovered that the enterprise was slipping from entrenched certainty to a doubtful entity, it was his right to protect the balance of his interest from spoliation. Because his share of the assets in 1950 were worth much more than his original investment in 1943, he was not obliged to sit supinely by to see whether appellant would rebuild it to higher levels. From the statistics taken from the records of the partnership, it was evident that a rare type of ingenuity would be essential to the restoration of prosperity to the house of Sinclair and it did not appear to be available.

Section 15032, *supra*, provides for a dissolution when business can be continued only at a loss. That statute does not designate the measure or speed of the loss. But it does mean that if the partnership will continue to lose, a partner may insist upon a dissolution. Respondent was reasonable in his approaches. He offered to sell his share for $75,000 or to pay the same amount for that of appellant. Not only did appellant scorn such offer but he in turn offers to pay only $60,000 for respondent's share, or to sell his own to respondent for $85,000. If a blind man had searched for bad faith in those negotiations he would surely have been led to the altar where

appellant prays.  It is the rule that there is no such thing as an indissoluble partnership (*Bates* v. *McTammany,* 10 Cal.2d 697, 701 [76 P.2d 513]), and that of Sinclair is no exception.

Respondent has argued at length that appellant is estopped to assert the alleged inequitable conduct and has sought to establish that even if he had been the agent of Home Ice, still he would not have violated section 54 of the A. B. C. Act. Inasmuch as it has been established that respondent is not stained with any crime or inequitable conduct and was therefore at liberty to sue for an accounting, we forego discussion of respondent's further defensive arguments.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied December 5, 1952, and appellant's petition for a hearing by the Supreme Court was denied January 15, 1953.