Filed 7/23/24  Weinstein v. Hines CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| STEVEN WEINSTEIN, | B318163 |
| Plaintiff and Appellant, | |
| v. | Los Angeles County Super. Ct. No. 19CHCV00400 |
| OSCAR JOE HINES et al., | |
| Defendants and Respondents. | |

APPEAL from order and judgment of the Superior Court of Los Angeles County.  Stephen Pfahler, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Glenn Stern Law, Glenn E. Stern and Frederick H. Alschuler for Plaintiff and Appellant.

Horvitz & Levy, Dean A. Bochner, Lacey L. Estudillo; David Weiss Law, David J. Weiss and Nicholas A. Weiss for Defendants and Respondents.

_____

This appeal is from a judgment entered for defendants and respondents Oscar Joe Hines and Kit M. Song after the trial court sustained their demurrer without leave to amend the second amended complaint (SAC) of plaintiff and appellant Steven Weinstein.  Also named as a defendant in the SAC is The Regents of the University of California (The Regents).  The Regents is not a party to this appeal and our references to "defendants" are to defendants Hines and Song only.

We affirm the judgment in part and reverse it in part.  We remand with directions to enter a new order (1) overruling the demurrer as to plaintiff's causes of action for intentional infliction of emotional distress and negligence; (2) sustaining the demurrer with leave to amend the cause of action under Labor Code sections 1050 and 1054 for misrepresentation preventing a former employee from obtaining employment; and (3) sustaining without leave to amend all other causes of action.

## BACKGROUND

### 1.    Allegations of the Second Amended Complaint

Plaintiff and appellant Steven Weinstein has been a licensed physician and surgeon since 1984.  Defendants and respondents Oscar Joe Hines and Kit M. Song are also physicians.  For a time beginning in 2015, the three doctors worked together at the Northridge Hospital Medical Center.  They worked within the UCLA Health system and were employees of The Regents through The Regents' UCLA Medical Group.

In June 2016, a 41-year-old female patient presented to plaintiff for a preoperative consultation about possible gall bladder surgery.  She was accompanied at the appointment by her eight-year-old son.  The patient was overweight and had a

family history of breast cancer. She also had various mental health issues for which she was prescribed numerous medications. In performing his history and physical examination, plaintiff performed a breast exam on the patient, to which she did not object.

Plaintiff alleges this examination was part of his custom and practice, as well as The Regents' guidelines. Plaintiff had expertise in matters of breast health. He held breast health leadership positions with his former employer and was "knowledgeable about and skilled and experienced in the performance of breast examinations and the importance of same in early detection of breast cancer."

Following his examination of the patient, plaintiff discussed her biliary tract disease and related symptoms as well as the surgical procedure for treating them. The patient stated she wished to proceed with the surgery and signed a consent form for it.

However, shortly after the appointment, the patient contacted her referring physician and asked for a recommendation for another surgeon. She said she did not like plaintiff and did not feel comfortable going to him. The following day, after plaintiff unsuccessfully tried to contact her, the patient messaged her referring physician, explaining: " '[plaintiff] was very rude to my son, who is a very sweet [*sic*]. You've met him; he's a good boy. Also, he did a breast exam which really took [*sic*] aback. Seems inappropriate. He was a jerk and a creep . . . .' " The patient also called plaintiff and stated she was unhappy he had done a breast exam and about his interaction with her son at the appointment. She said she was going to a different surgeon for her operation.

3

Immediately after his call with the patient, plaintiff reported the interaction to the director of operations for his practice group, Annette Mosley, and suggested she report the matter to risk management. He also voluntarily told his office staff that he would have a female nurse present for any future breast exam and that he would refrain from performing breast exams during preoperative history and physical examinations unless specifically medically indicated.

The next day, Ms. Mosley spoke with defendant Song, medical director of Surgical Services, about the patient complaint. According to Ms. Mosley's notes, " 'Dr. Song agrees [the Joint Commission on Accreditation of Healthcare Organizations] encourages surgeons to complete History and Physicals [(H&P)] as a routine step in patient pre-op care. He agrees that breast exam is a routine step in the H&P.' "

The patient, while satisfied with being rescheduled with another surgeon, remained concerned about her interaction with plaintiff. She submitted an online complaint to The Regents, via UCLA Health, that she did not feel the breast exam performed by plaintiff was necessary. She also alleged for the first time that plaintiff told her he needed to perform pelvic and rectal exams, but she " 'made it clear he would not be doing either.' " A week later, she submitted another online complaint stating that plaintiff asked her to remove her bra in his presence and warned her there would be fines if she did not submit to breast, pelvic and rectal examinations. (Plaintiff alleges what he actually said was that, if he performed incomplete or inappropriate treatments, it could negatively affect the Medicare reimbursement rates for the hospital.)

4

A patient liaison nurse for The Regents forwarded these complaints to plaintiff a few days later as part of a notice that the patient had filed a grievance against him. Also copied was defendant Hines, chief of the Division of General Surgery. Dr. Hines contacted Dr. Song, who in turn contacted plaintiff to advise that Dr. Hines would be getting in touch with him. Dr. Hines called plaintiff two days later and they discussed the patient complaint but did not delve into its substance. In the ensuing weeks, neither Drs. Song nor Hines conducted any further investigation of the patient's complaints.

In early August 2016, Dr. Hines e-mailed Dr. Song and the patient liaison nurse to state that he and Dr. Song both interviewed plaintiff, and " '[g]oing forward all female patients will be examined by [plaintiff] with a member of the clinic staff in the patient room, [plaintiff] will limit components of the physical exam to those that are specific to the patient's condition . . . , a letter of concern was sent to [plaintiff] from UCLA Health, [and plaintiff's] practice will be audited every 3 months for compliance . . . .' " Plaintiff disputes that Drs. Song and Hines ever interviewed him or that his practice was subject to audits. He alleges he "was never advised of these 'conditions' . . . and never agreed to them." A letter signed by Dr. Hines listing these conditions was mailed to the patient. Plaintiff was not notified of the letter at the time.

According to plaintiff, if the conditions recited in the letter *had* been imposed, it would have triggered obligations on defendants under Business and Professions Code section 805, subdivisions (a)(7) and (b)(3) to notify the California Medical Board. Defendants made no such report at the time.

In October 2016, The Regents and defendants renewed plaintiff's employment agreement.

In February 2017, the patient filed a police report concerning her interaction with plaintiff. The police interviewed plaintiff but took no further action against him. The police also notified The Regents they received a report about plaintiff from the patient. "After learning of the patient's police report, [defendants] immediately went into 'self-protection' and 'self-survival' mode, fearing for their own jobs and protecting their own pecuniary interests for potentially being viewed by The Regents as not taking any action against [plaintiff], even though they had already determined six to seven months earlier that there was no basis for taking any action against [plaintiff]. The only new factor in the equation was the patient filing a police report, prompting [defendants] to corruptly and maliciously move forward to 'scapegoat' [plaintiff] and do whatever they could to ensure that they were not accused of mishandling the patient complaint and save their own jobs."

The first step Dr. Hines took in the alleged scheme was to send a letter to plaintiff, on February 9, 2017, purporting to document defendants' response to the complaint. Plaintiff calls this "the 'CYA' letter." It stated—falsely, according to plaintiff—that defendants reviewed the patient's written complaints and concluded the breast examination was not within the standard of care and that, as a result of the complaint, plaintiff had agreed to restrictions imposed on his practice (a chaperone for all examinations of female patients; no breast, pelvic, or rectal examinations unless specifically related to the patient's complaint; and quarterly audits to ensure his compliance). The letter further stated defendants intended to make a report to the

6

California Medical Board about the complaint pursuant to Business and Professions Code sections 805 and 805.01 because their review constituted "peer review activity."

Plaintiff alleges any review by Drs. Hines and Song could not have constituted peer review activity because fewer than all persons required under applicable bylaws of The Regents and the hospital where they worked had been involved. He further alleges the misrepresentations in the February 9, 2017 letter "were known to be completely false and made with the conscious intent to deceive and cause harm to [plaintiff's] position with The Regents for the sole purpose of saving [defendants'] jobs."

The letter advised plaintiff of his right to request a hearing on the imposition of restrictions and notified him that he was suspended from his position. Plaintiff retained counsel and requested a hearing. The hearing was initially set for the end of May 2017 but was repeatedly postponed.

In June 2017, The Regents threatened to fire plaintiff and told him he should resign instead. He resigned.

About two months later, defendants filed a report with the California Medical Board pursuant to Business and Professions Code section 805. It included statements plaintiff alleges are false, including that restrictions had been placed on his practice; that he had voluntarily accepted the restrictions; that he resigned following notice of an impending investigation; and that an investigation had been initiated in July 2017. Plaintiff, through counsel, disputed the contentions in the report with The Regents.

A few days later, The Regents, through Dr. Hines, furnished plaintiff with an amended notice of charges to be considered at his hearing. These charges largely reiterated the

issues raised in the February 2017 letter but added that pelvic and rectal examinations were also medically unnecessary in the context of plaintiff's evaluation of the patient. The notice further advised The Regents would be reporting the restrictions to the National Practitioner Data Bank (NPDB) pursuant to section 11133(a)(1)(B)(i) of title 42 of the United States Code. Such a report was made on August 30, 2017. Plaintiff alleges this report falsely stated there was an investigation pending against him in June 2017.

After numerous delays caused by The Regents, the administrative review hearing went forward in March 2018. Dr. Song and Ms. Mosley each testified. Dr. Song testified he had no knowledge of the standard of care applicable to plaintiff's interaction with the patient. He further admitted neither he nor Dr. Hines interviewed anyone about plaintiff's interaction with the patient; that he (Dr. Song) was unaware of restrictions ever having been communicated to plaintiff; and that plaintiff did not violate any policies or procedures in his interaction with the patient.

Ms. Mosley similarly testified she did not believe plaintiff had violated any policy, procedure, or standard of care in his interaction with the patient.

Plaintiff next sought testimony from Dr. Hines. However, Dr. Hines was unavailable for several weeks. Based on, among other things, delays and other claimed violations of the internal procedures governing the hearing process, plaintiff asked the hearing officer to dismiss the action. "With [defendant] Hines'[s] testimony pending, and in light of the testimony favorable to [plaintiff's] position provided by [Dr.] Song and [Ms.] Mosley, . . .

8

[d]efendants agreed to dismiss the allegations against [plaintiff] and ended the hearing proceeding."

Two months later, the California Medical Board notified plaintiff it " 'did not find a departure from the standard of care' " in his interaction with the patient but suggested he offer to use a chaperone in any future breast examination.

Nevertheless, The Regents and defendants "refused to file supplemental and/or corrective reports to the [California] Medical Board and/or the [NPDB] advising that the hearing against [plaintiff] had been dismissed, leaving the false and damaging accusations and adverse actions taken against [plaintiff] on record at both the [California Medical Board] and the [NPDB], rendering it impossible for [plaintiff] to obtain employment as a Physician and Surgeon and causing him to lose his Board certification with the American Board of Surgery."

2.    **Procedural History**

Plaintiff filed this action against defendants and The Regents in 2019.  The original complaint included all of the causes of action asserted in the SAC, plus two more that are irrelevant for present purposes.  The Regents responded with a motion for judgment on the pleadings (MJOP) as to, in relevant part, plaintiff's causes of action for failure to perform mandatory duties (Gov. Code, § 815.6); intentional misrepresentation; intentional infliction of emotional distress, deprivation of due process rights (42 U.S.C. § 1983); use of fabricated evidence (42 U.S.C. § 1983); negligence; and negligence per se.  The trial court granted The Regents' MJOP with leave to amend as to all these causes of action.  Defendants also filed a MJOP but later withdrew it.

9

Following the trial court's ruling on The Regents' MJOP, plaintiff filed a first amended complaint (FAC), to which The Regents and defendants each demurred. The trial court decided The Regents' demurrer to the FAC but declined to rule on defendants', explaining its ruling on The Regents' demurrer rendered a ruling on the defendants' demurrer "substantially moot" due to overlap in the parties' arguments. The trial court largely sustained, with leave to amend, The Regents' demurrer but overruled the demurrer as to plaintiff's cause of action for intentional infliction of emotional distress. And, because plaintiff agreed to withdraw the cause of action for misrepresentation preventing a former employee from obtaining employment (Lab. Code, §§ 1050, 1054) against The Regents only, the trial court sustained The Regents' demurrer to that cause of action without leave to amend.

Plaintiff filed the SAC and defendants again demurred. The trial court sustained their demurrer without leave to amend as to each cause of action, largely on the basis of unspecified statutory immunities.

Plaintiff timely appealed.

## DISCUSSION

### 1. Demurrer and Standard of Review

A demurrer tests the legal sufficiency of the complaint. We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

"[W]e review the trial court's result for error, and not its legal reasoning." (*Davies v. Sallie Mae, Inc.* (2008)

10

168 Cal.App.4th 1086, 1090.)  Thus, we may affirm a judgment of dismissal if it is correct on any ground proffered in the demurrer. (*Aubry v. Tri-City Hospital Dist*. (1992) 2 Cal.4th 962, 967 (*Aubry*).)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)  Plaintiff has the burden to show a reasonable possibility the complaint can be amended to state a cause of action.  (*Ibid*.)

## 2.    Analysis

### a.    Immunities

"[I]n governmental tort cases 'the rule is liability, immunity is the exception.' [Citation.]  . . .  [Citation.]  'Accordingly, courts should not casually decree governmental immunity [.] . . .' [Citation.]  Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." (*Ramos v. County of Madera* (1971) 4 Cal.3d 685, 692 (*Ramos*).)

Here, defendants' grounds for immunity argued in their demurrer were spare, spanning just a few lines with no citation to authority beyond recitation of the statutory language.  In adopting defendants' undeveloped theories of immunity, the trial court did not clearly specify which immunity it was relying on to dismiss.  We review the claimed grounds for immunity with greater rigor.

11

### i. Discretionary Act Immunity under Government Code section 820.2

Government Code section 820.2 immunizes a public employee from liability for injuries "resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion was abused." (*Ibid.*)

There is no bright line test for when an act is discretionary as opposed to ministerial. In *Johnson v. State of California* (1968) 69 Cal.2d 782 (*Johnson*), our Supreme Court rejected a literal interpretation of "discretionary"—i.e., any act which can be performed in more than one way—in favor of a flexible approach informed by the purposes of the immunity. (*Id.* at p. 789.) Government Code section 820.2 is intended to insulate policymaking from judicial oversight. (*Johnson,* at p. 793.) "Courts and commentators have therefore centered their attention on an assurance of judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government." (*Ibid.*)

To help identify what constitutes a "basic policy decision," the court offered the distinction "between the 'planning' and 'operational' levels of decision-making." (*Johnson, supra,* 69 Cal.2d at p. 794.) Assessing whether a decision rises to the level of "planning" exempt from judicial oversight "requires sensitivity to the considerations that enter into it and an appreciation of the limitations on the court's ability to reexamine it." (*Ibid.*) Courts must "find and isolate those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the government

decision." (*Ibid*.) These areas contrast with "routine duties incident to . . . normal operations," which are ministerial in nature. (See *Barner v. Leeds* (2000) 24 Cal.4th 676, 685.)

The burden lies with the person claiming immunity under Government Code section 820.2 to prove "a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision." (*Johnson*, *supra*, 69 Cal.2d at p. 794, fn. 8.)

Plaintiff contends defendants' course of conduct alleged in the SAC does not qualify for discretionary immunity because it implicates no policy making. Defendants did not balance the risks and advantages of a particular course of action in furtherance of a particular governmental objective; rather, they acted reflexively to the prospect of losing their jobs and entirely out of self-interest.

Defendants argue they are immune because plaintiff challenges their decisions "to impose restrictions on [plaintiff's] medical practice, suspend his employment, and initiate a peer review proceeding." They contend these are "basic policy decisions" subject to immunity pursuant to caselaw that "decisions of public employees to institute disciplinary proceedings to terminate a plaintiff's employment" are covered by Government Code section 820.2.

We begin by noting plaintiff's primary theory of harm is that he can no longer work as a physician because defendants failed to fulfill their mandatory obligations to update their reports to the California Medical Board and the NPDB when the internal proceedings against plaintiff were dismissed. He also alleges the way defendants treated him after restricting his

13

practice and suspending his employment violated The Regents'/Northridge Hospital Medical Center's Staff Bylaws and The Regents'/UCLA Medical Group's Fair Process Procedure. While defendants identify a few allegations faulting the imposition of restrictions, those allegations are incidental and nonessential to the causes of action—intentional infliction of emotional distress and violations of his due process rights—to which the allegations relate. Plaintiff also supports these causes of action with allegations of misconduct after the initial decisions to discipline plaintiff, such as mishandling his hearing process, falsifying evidence, and wrongfully and otherwise improperly reporting his conduct.

We agree with plaintiff that the SAC does not establish a right to immunity under Government Code section 820.2. Plaintiff alleges a comprehensive framework of policies, rules, statutes, regulations and bylaws governed the handling of the patient's complaint, through and including the reporting and failure to file supplemental reports that are at the core of the SAC. In *Ramos, supra,* 4 Cal.3d at pages 693–695, our Supreme Court denied immunity under section 820.2 for a public entity's implementation of public aid programs because the eligibility criteria were comprehensively established by statute. The court in *Toney v. State of California* (1976) 54 Cal.App.3d 779 used the same rationale to find no section 820.2 immunity for a state college against claims by a professor that the college mishandled disciplinary proceedings against him: "The manner of carrying out the disciplinary proceedings against [the professor] pursuant to [the] executive order [governing academic personnel discipline], which carefully detailed all procedures to be followed, is . . . ministerial and operational rather than discretionary,

14

including the failure to dismiss those proceedings and permitting the proceedings to remain pending for some eight months." (*Toney,* at p. 793.)

Defendants fail to identify how their actions against plaintiff amounted to "quasi-legislative policy making." To the contrary, it appears from the SAC that their course of conduct was heavily regulated by existing policies. "[T]here is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." (*Barner v. Leeds*, *supra*, 24 Cal.4th at p. 685.)

Defendants rely on two cases as purportedly establishing Government Code section 820.2 immunity for decisions to institute disciplinary proceedings and terminate a plaintiff's employment. Even if plaintiff's theory of liability were based on the decisions to restrict his practice and suspend him, we would still be unpersuaded that, on the face of the SAC, defendants would be entitled to immunity under the authorities cited.

Defendants' first case is *Caldwell v. Montoya* (1995) 10 Cal.4th 972 (*Caldwell*). *Caldwell* concerned claims against members of a school board for allegedly terminating a school superintendent in violation of the Fair Employment and Housing Act. (*Caldwell,* at p. 977.) The court found that immunity was appropriate under *Johnson*'s separation of powers rationale because of statutes "plac[ing] the superintendent's employment within the sole authority and discretion of the [school] district's governing board." (*Caldwell,* at p. 982.) Decisions concerning the employment of school superintendents were "therefore 'expressly entrusted to a coordinate branch of government' at its highest level." (*Ibid.*) Moreover, the court observed a superintendent is "the district's foremost appointed official, with primary

15

responsibility for representing, guiding, and administering it. [Citation.]  The governing board's choice about who should occupy this crucial post is therefore a peculiarly sensitive and subjective one, with fundamental policy implications."  (*Id*. at p. 983.)

We agree with plaintiff that these considerations do not apply to the relationship between him and defendants.  There are no allegations in the SAC that defendants have broad discretion over the employment of physicians at The Regents or the UCLA Medical Group.  We presume Dr. Hines, by signing a letter restricting plaintiff's practice and suspending his employment, had authority to do so, but plaintiff alleges his authority is subject to oversight by a hearing board with the power to override his decision if proven unwarranted.  Unlike the school board members in *Caldwell*, defendants cite no statutes vesting them with sole authority and discretion over plaintiff's employment.  Further, unlike the plaintiff in *Caldwell*, the SAC does not allege plaintiff held a leadership position in implementing The Regents' policies.  The allegations are that plaintiff was a rank-and-file surgeon working on annual contracts.

In *Caldwell*, it was also important to the court that the complaint alleged "an *actual, conscious and considered* collective policy decision to replace plaintiff as superintendent," and "admit[ted] . . . no theory that the Board acted unconsciously or failed to weigh pros and cons."  (*Caldwell*, *supra*, 10 Cal.4th at p. 984.)  Plaintiff alleges defendants did not take policy into account when suspending him but rather acted exclusively in self-interest to preserve their own jobs.

Defendants' second case is *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426 (*Kemmerer*), disapproved on another ground in *Quigley v. Garden Valley Fire Protection Dist.* (2019)

16

7 Cal.5th 798, 815, footnote 8. That case found government employees immune from claims of a subordinate based on their decision to initiate disciplinary proceedings against him, resulting in his termination. The court held the decision to initiate the proceedings was a policy decision because it was "entirely within" the discretion of the defendant's office and "involve[d] the exercise of analysis and judgment as to what is just and proper under the circumstances and is not a purely ministerial act." (*Kemmerer*, at p. 1438.)

Kemmerer is difficult to reconcile with our Supreme Court's opinion in *Johnson*. First, *Kemmerer* relied on the pre-*Johnson* decision in *Burgdorf v. Funder* (1966) 246 Cal.App.2d 443, 448, 449 to deem "discretionary" actions requiring consideration of "what is just and proper under the circumstances." (See *Kemmerer, supra*, 200 Cal.App.3d at pp. 1437, 1438.) This interpretation of "discretionary" is no longer good law after *Johnson*. (See *Wheeler v. County of San Bernardino* (1978) 76 Cal.App.3d 841, 849 [*Burgdorf* definition of discretion "no longer a correct statement of the law"]; *Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 414 ["The broad rule of discretionary immunity suggested by . . . *Burgdorf* must be reexamined in the light of [*Johnson, supra*, 69 Cal.2d 782].".)

Second, the *Kemmerer* court justified immunity out of an outdated concern that liability for subjecting coworkers to discipline would "bode ill for the continuing efficiency and morale of the civil service system" and, without immunity, "[s]upervisors within the civil service system would not be able to fulfill their function without the overhanging threat of legal action from employees who become subject to discipline." (*Kemmerer, supra*, 200 Cal.App.3d at p. 1439.) But *Johnson* held "[t]*he danger that*

17

*public employees will be insufficiently zealous in their official duties does not serve as a basis for immunity in California.*" (*Johnson, supra*, 69 Cal.2d at p. 790.)

Whatever value *Kemmerer* may have, we find it is distinguishable on its facts. In granting Government Code section 820.2 immunity, the *Kemmerer* court emphasized that the discipline followed a thorough investigation that uncovered wrongdoing, and the finding of wrongdoing was later validated by a civil service commission that reviewed the matter. (*Kemmerer, supra*, 200 Cal.App.3d at pp. 1439–1440.) While we acknowledge that a decision need not be correct to be entitled to protection, the *Kemmerer* facts indicate a considered and informed decision to discipline the plaintiff based on the governmental interests at stake. Plaintiff alleges the discipline he faced was administered with no such consideration.

For these reasons, we conclude the demurrer was not properly sustained on the basis of Government Code section 820.2 immunity.

### ii. Prosecutorial immunity under Government Code section 821.6

Government Code section 821.6 immunizes a public employee from liability for injuries "caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (*Ibid.*)

The statute applies to "claims of injury arising from a public employee's initiation or prosecution of an official proceeding, whether the act was allegedly done with malice and without probable cause, as required for a malicious prosecution action, or was allegedly tortious for other reasons." (*Leon v.*

18

*County of Riverside* (2023) 14 Cal.5th 910, 929.)  Though traditionally associated with immunity from claims for malicious prosecution, it also applies to "claims of injury based on tortious or wrongful prosecution.  The immunity is narrow in the sense that it applies only if the conduct that allegedly caused the plaintiff's injuries was the institution or prosecution of an official proceeding.  But this immunity is broad in the sense that it applies to every such tort claim, whether formally labeled as a claim for malicious prosecution or not."  (*Id*. at p. 922.)

Defendants claim they are immune from liability for the initiation and prosecution of the administrative proceeding regarding the restrictions they imposed on his medical practice. Plaintiff does not dispute this.

However, plaintiff contends "the crux" of his complaint was that defendants "failed and refused to provide the mandatory corrections to the California Medical Board and the [NPDB]." The SAC alleges this failure took place after the administrative proceedings against him had been dismissed.  We agree with plaintiff that no immunity under Government Code section 821.6 applies to harms resulting from defendants' postdismissal conduct.  (Cf. *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 719 [§ 821.6 immunity applies to acts to institute and prosecute; not those taken after conclusion of proceedings].)

iii.    **Misrepresentation immunity under Government Code section 822.2**

Government Code section 822.2 immunizes a public employee from liability for injuries "caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is guilty of actual fraud, corruption or actual malice."  (*Ibid*.)  Misrepresentation

19

immunity under section 822.2 cannot apply as a matter of law to any of plaintiff's causes of action other than intentional misrepresentation.  (See *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 383 [immunity limited to common law deceit torts; does not extend to causes of action based on allegations defendant caused harm by "provid[ing] inaccurate information to *third parties*"].)  We need not consider whether defendants are entitled to immunity from plaintiff's intentional misrepresentation cause of action because, as discussed *post*, the underlying misrepresentations cannot support a cause of action as a matter of law.

> ### b.   Causes of Action
>
> #### i.   First cause of action (failure to perform mandatory duties)

Government Code section 815.6 provides:  "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  (*Ibid*.)

Defendants argue they cannot be liable under this provision because neither is a "public entity."  Plaintiff objects that they did not raise this argument below.  However, "[w]e can reach a ground for demurrer that was not raised below if it presents a pure question of law."  (*Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 357.)

Government Code section 815.6, by its plain language, does not impose liability on individuals like Drs. Hines and Song.  "Public entity" is defined for purposes of the Government Claims

Act (Gov. Code, §§ 810–996.6) as including "the state, the Regents of the University of California, the Trustees of the California State University and the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." (§ 811.2.) "Public employee," on the other hand, is defined as "an employee of a public entity." (§ 811.4.) The act "clearly differentiates between entity liability (Gov. Code, § 815 et seq.) and employee liability (Gov. Code, § 820 et seq.)." (*Bradford v. State of California* (1973) 36 Cal.App.3d 16, 19.) Section 815.6 is within the provisions addressing public entity liability and speaks only of liability of public entities. It cannot impose liability on individual defendants.

The cases plaintiff cites for the proposition that "[a]n action under Government Code section 815.6 may include public employees" does not persuade us otherwise. None of the cases holds a public employee may be liable under section 815.6. "A case is not authority for a proposition not even mentioned, much less discussed, in it." (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327, 342.)

The trial court correctly sustained the demurrer to this cause of action without leave to amend.

### ii. Second cause of action (intentional misrepresentation)

The SAC alleges that Drs. Hines and Song made numerous misrepresentations in the letters that Dr. Hines sent to plaintiff in February 2017 and August 2017. These allegations do not state a cause of action for intentional misrepresentation, and plaintiff fails to satisfy his burden of showing a reasonable possibility he could amend to cure his pleading deficiencies.

21

The elements of intentional misrepresentation are: "(1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230–231.) "Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable probability, have entered into the contract or other transaction." ' " (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976 (*Engalla*).)

The trial court found the allegations of actual and justifiable reliance lacking from the SAC. In his opening brief, the only citation plaintiff provides to an allegation of reasonable reliance is paragraph 120 of the SAC, where plaintiff alleges "[plaintiff] reasonably relied on Hines'[s] and Song's representations." In conducting our de novo review, "we must disregard any 'contentions, deductions or conclusions of fact or law alleged . . . .' " (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.) Plaintiff's citation to a single boilerplate allegation does not show error.

On reply, plaintiff asserts he is excused from alleging reliance because he alleged that the misrepresentations were material. For this proposition, he relies on *Engalla, supra,* 15 Cal.4th 951 for the proposition that "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." (*Id.* at p. 977.) A misrepresentation is material if " 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.' " (*Ibid.*) Plaintiff fails to identify which misrepresentations he contends were

material.  The SAC's primary allegations supporting this cause of action are purported misrepresentations made *to* plaintiff *about* plaintiff—that his encounter with the patient did not comply with the standard of care; that he was subjected to restrictions in his practice at the time of the patient's complaint; that he agreed to those restrictions; and that he admitted proposing a pelvic and rectal exam to the patient.  To the extent these statements were false, plaintiff necessarily knew this when they were made as they were about things that he did or experienced firsthand.  Moreover, plaintiff does not identify how these misrepresentations might have affected his course of action in a transaction.

Plaintiff offers in his reply that he could amend his allegations to show he relied on defendants' representations to him that they would comply with their own obligations and generally treat him fairly.  Plaintiff does not explain, and it is unclear to us, what he might have done in reliance on these purported misrepresentations.  (See *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 (*Rakestraw*) [to show entitlement to leave to amend "a plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading' "].)

Finally, plaintiff contends he could amend to allege defendants told him there was no finding he failed to meet the standard of care in his interaction with the patient, and that no action would be taken against him.  As a result, plaintiff asserts, he made no investigation into the patient's complaint, took no steps to protect himself, and entered into a new employment agreement with The Regents in November 2016.  But his existing

allegations show these proposed allegations about pre-November 2016 representations are not actionable misrepresentations.

"To maintain an action for deceit based on a false promise, one must specifically allege . . . the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 159.)  Plaintiff alleges there was no finding of substandard care until defendants falsely asserted there was in defendant Hines's February 2017 letter, prompted by the patient's police report filed earlier that month.  Plaintiff alleges no further action would have been taken against him but for the patient's February 2017 police report.  He says defendants "had already determined six to seven months earlier that there was no basis for taking any action against [plaintiff]" and that only "the patient filing a police report[] prompt[ed] [defendants] to corruptly and maliciously move forward to 'scapegoat' [plaintiff] and do whatever they could to ensure that they were not accused of mishandling the patient complaint and save their own jobs."  Thus, any pre-February 2017 statement that there was no finding plaintiff failed to meet the standard of care in his interaction with the patient, and that no action would be taken against him, could not have been false when made.  To the contrary, plaintiff's allegations are that defendants believed their statements were true when they made them.

Plaintiff fails to show the trial court abused its discretion in denying leave to amend.  (See *Rakestraw*, *supra*, 81 Cal.App.4th at p. 44.)

### iii. Fourth and fifth causes of action (intentional interference with contractual relations and prospective economic relations)

These causes of action are predicated on defendants' alleged interference with plaintiff's relationship with The Regents—the counterparty to plaintiff's employment contract. Defendants argue they cannot be liable under these theories because they are not "strangers" to the relationship. In support, they cite plaintiff's allegations that defendants acted as "agents" of The Regents, and they cite authority that agents of contract parties cannot be liable for interference. (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 999–1000, disapproved on another ground in *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1148.)

Plaintiff responds that his allegation defendants acted "individually, and as employees, agents, and/or servants" was "generalized and in-the-alternative" and, in reality, defendants were just "employees of The Regents . . . and nothing further." He then explains that "[a]gency and employment are distinct relationships[, and] [o]ne may be an employee but not an agent of the employer with regard to any given transaction. [(]*Wallace v. Sinclair* (1952) 114 Cal.App.2d 220, 230.[)]" He asserts, without citation to the SAC, that defendants "had no role in the contractual transaction between [plaintiff] and The Regents and had no authority pursuant to the contract to represent The Regents."

As a preliminary matter, plaintiff's efforts to argue defendants were non-agent employees with "no role" in plaintiff's contractual relationship with The Regents is belied by the SAC.

25

For example, in alleging his employment contract was renewed in 2016, plaintiff says it was The Regents *and defendants* who approved it.  He also alleged it was The Regents *and* "*[d]efendants*" who threatened to fire him.  As a public corporation (see *Gomez v. Regents of University of California* (2021) 63 Cal.App.5th 386, 399), The Regents can act only through its agents (see *Arnold v. San Jose* (1889) 81 Cal. 618, 619).  As no other individuals are alleged to have approved plaintiff's employment contract or threatened to terminate it, it is difficult to see how defendants did not act as The Regents' agents by these allegations.

In any event, whether defendants were "agents" or "employees" is a distinction without a difference for these purposes.  In *Shoemaker v. Myers* (1990) 52 Cal.3d 1, our Supreme Court observed "that corporate agents *and employees* acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract."  (*Id.* at p. 24, italics added.)  In that case, the plaintiff sought recovery from his "supervisors:  agents of the employer who are vested with the power to act for the employer (rightly or wrongly) in terminating plaintiff's employment.  For the purposes of [his] cause of action [for interference with prospective economic advantage], then, these defendants stand in the place of the employer, because the employer—the other party to the supposed contract—cannot act except through such agents.  [¶]  Thus, there is no viable 'inducement of breach of contract' or 'interference with economic advantage' that is distinguishable from a cause of action for breach of contract."  (*Id.* at p. 25.)

There was no error in the trial court denying plaintiff leave to amend these causes of action.

#### iv.     Sixth cause of action (intentional infliction of emotional distress)

The trial court relied exclusively on defendants' claimed immunities in sustaining their demurrer to plaintiff's cause of action for intentional infliction of emotional distress.  In light of our discussion about the claimed immunities, *ante*, the question before us is whether, disregarding his allegations about initiating and prosecuting the administrative hearing against him,[1] plaintiff adequately pled the elements of the cause of action.  We conclude he did.

To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege:  " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ."  Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.]  The defendant must have engaged in 'conduct intended to inflict injury or engaged in with the realization that

---

[1]     At oral argument, counsel for defendants suggested the allegations supporting plaintiff's cause of action for intentional infliction of emotional distress were covered by prosecutorial immunity, Government Code section 821.6.  We disagree.  Plaintiff's allegations are that defendants' investigation into the patient's complaint, if any, concluded not later than June 2016 and, following their February 2017 letter, they actively sought to deny plaintiff a bona fide administrative proceeding even after he demanded one.  In considering this cause of action, we rely on allegations about defendants' conduct in the intervening period.

injury will result.' " (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.)

Here, the only issue in dispute is whether plaintiff pled conduct that is "outrageous." Conduct is "extreme and outrageous" when it is " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Christensen v. Superior Court*, *supra*, 54 Cal.3d at p. 903.) " ' "[T]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." ' " (*McDaniel v. Gile* (1991) 230 Cal.App.3d 363, 372.) Whether conduct is "outrageous" is ordinarily a question of fact. (*So v. Shin* (2013) 212 Cal.App.4th 652, 672.)

Defendants argue their actions amount to mere "personnel management decisions." For this proposition, they rely on *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, which held that "[a] simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." (*Id*. at p. 80.) *Janken* does not support the proposition that superiors and employers who make employment decisions are incapable of engaging in outrageous conduct.

Other cases have held an employee stated a cause of action for intentional infliction of emotional distress against the employer and certain supervisors. (See, e.g., *Lagies v. Copley* (1980) 110 Cal.App.3d 958, 974 [the defendants intentionally humiliated the plaintiff, singled him out for denial of merit raises, demoted and blackballed him, thus precluding other employment], disapproved on another ground in *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 738; see also *Rulon-*

28

*Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241 [supervisor was deceitful in claiming recent discovery of employee's personal relationship with a competitor's employee, acted in violation of company policy, and condescendingly offered and then rescinded the chance to choose between the relationship and the employee's job], overruled on another ground in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351.)  The *Rulon-Miller* court found the "statements and conduct would under any reasoned view tend to humiliate and degrade" the employee, and communicated to the employee she was "powerless" in the situation.  (*Rulon-Miller,* at p. 255.)  It considered "such powerlessness [to be] one of the most debilitating kinds of human oppression."  (*Ibid*.)

Plaintiff alleges defendants lied to him and The Regents when they belatedly assessed his interaction with the patient as not within the standard of care.  He alleges they did this because they were afraid of losing their jobs when the patient's police report might have suggested to defendants' superiors her concerns warranted more attention than defendants had given them months earlier.  To carry out their plan of "scapegoat[ing]" plaintiff, defendants falsely asserted plaintiff had been subject, and agreed, to restrictions which he had not, and made admissions which he had not.  They also asserted the patient interaction was reportable to the California Medical Board.  In sum, plaintiff's superiors with direct authority over his employment were allegedly gaslighting him and threatening actions that would adversely affect his ability to continue in his profession.  The sense of powerlessness this might impart would have been amplified by defendants' alleged attempt to deny plaintiff the administrative hearing to which he was entitled,

29

and, once that hearing was dismissed, refusal to file corrective reports with the California Medical Board and NPDB. Whether this conduct is outrageous is a question of fact.

The trial court erred by sustaining defendants' demurrer to plaintiff's cause of action for intentional infliction of emotional distress.

<strong>v.      Seventh cause of action (deprivation of due process rights; 42 U.S.C. § 1983)</strong>

Plaintiff's cause of action for deprivation of due process rights is based on defendants "violating his inalienable and fundamental rights to pursue employment as a physician and surgeon and/or to make a contract to work as a physician and surgeon." They did this, plaintiff explains, by "fail[ing] and refus[ing] to file the mandatory supplemental reports correcting their false [Business and Professions Code section] 805 Reports."

A cause of action under section 1983 of title 42 of the United States Code exists where a person acting under color of state law violates " 'a right secured by the Constitution and laws of the United States.' " (*Arce v. Childrens Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1472.) We " ' "look to federal law to determine what conduct will support an action under section 1983." ' " (*Ibid.*) Plaintiff here relies on the Fourteenth Amendment of the United States Constitution, which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law."

One liberty interest embraced by the Fourteenth Amendment is an individual's right to pursue an occupation or profession of his choosing. (*Dittman v. California* (9th Cir. 1999) 191 F.3d 1020, 1029.) A liberty interest is implicated in the employment termination context where the government makes

30

stigmatizing statements that have the effect of completely excluding the terminated employee from his chosen profession. (*Blantz v. Cal. Dept. of Corrections & Rehabilitation* (9th Cir. 2013) 727 F.3d 917, 925.)  Statements suggesting only incompetence or lack of ability are inadequately stigmatizing to implicate a liberty interest.  (*Id.* at p. 925, fn. 6.)  Further, stigmatizing statements must be publicized by the employer to implicate a liberty interest.  (*Perez v. City of Roseville* (9th Cir. 2019) 926 F.3d 511, 523.)

Defendants contend plaintiff failed to plead adequately stigmatizing statements to support his due process cause of action.  The SAC alleges the Business and Professions Code section 805 report forming the basis of the cause of action stated plaintiff was subject to restrictions " 'for a medical disciplinary cause or reason.' "  Similarly, the report to the NPDB reflected plaintiff had resigned in relation to an investigation into his "professional competence or conduct."  These statements go only to plaintiff's competence as a practitioner of medicine.

Plaintiff responds that he pled defendants falsely accused him of "conduct[ing] unnecessary breast and rectal exams on a patient, in essence accusing him of assault and battery, as well as perverse and/or abusive conduct toward a patient."  Plaintiff fails to point to allegations that defendants publicized these statements.  Plaintiff proposes no amendment that would cure this pleading deficiency.  Plaintiff therefore fails to show the trial court erred in sustaining the demurrer to his cause of action without leave to amend.  (Cf. *Federal Deposit Ins. Corp. v. Henderson* (9th Cir. 1991) 940 F.2d 465, 477 ["[f]atal to [the plaintiff's] claim that [the defendant] deprived him of a protected liberty interest is . . . that none of the *public pronouncements* for

31

which [the defendant] was responsible can be said to impugn [the plaintiff's] morality or question his honesty" (italics added)].)

>       **vi.      Eighth cause of action (use of fabricated evidence; 42 U.S.C. § 1983)**

A cause of action for use of fabricated evidence under section 1983 of title 42 of the United States Code arises when the defendant provides evidence, knowing it to be false, causing the deprivation of the plaintiff's life, liberty, or property. (CACI No. 3052; *Costanich v. Dept. of Soc. & Health Servs.* (9th Cir. 2009) 627 F.3d 1101, 1110 (*Costanich*).)  To establish the causation element, "the plaintiff must show that (a) the act was the cause in fact of the deprivation of [the protected interest], meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question."  (*Spencer v. Peters* (9th Cir. 2017) 857 F.3d 789, 798.)

Citing *Costanich*, plaintiff contends he adequately alleged this cause of action because he alleged fabrication of evidence. Plaintiff misreads *Costanich*.  For the cause of action to arise, the fabrication must "result in the deprivation of protected liberty or property interests . . . ."  (*Costanich*, *supra*, 627 F.3d at p. 1115.) In *Costanich*, the plaintiff alleged social workers fabricated evidence, resulting in her loss of a property interest in her foster care license and a liberty interest in the guardianship of her foster children.  (*Id.* at p. 1110.)  The act of fabrication is not independently actionable without the deprivation of the protected substantive right.  (*Ibid.*; see also *Zahrey v. Coffey* (2d Cir. 2000) 221 F.3d 342, 348 ["The manufacture of false evidence, 'in and of

32

itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."])

Plaintiff alleges defendants fabricated evidence in letters they sent him. He then alleges this fabrication resulted in loss of "his employment, past and future." Plaintiff does not argue he had a property interest in his past employment with The Regents. Indeed, he appears to concede he did not. The only constitutionally protected interest he claims relating to his employment is a liberty interest in his ability to practice medicine elsewhere. We have already determined this liberty interest was not implicated by the public reports made to the California Medical Board and NPDB. The allegations defendants allegedly made privately to plaintiff likewise do not implicate his ability to practice medicine.

Thus, like the trial court did, we conclude plaintiff's failure to establish loss of a federally protected interest defeats his cause of action for fabrication of evidence. And because plaintiff does not offer curative amendments to establish loss of a protected interest, he fails to show the trial court abused its discretion in denying him leave to amend.

**vii.     Ninth cause of action (misrepresentation preventing former employee from obtaining employment)**

Labor Code section 1050 provides: "Any person, or agent or officer thereof, who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor." Section 1054 provides for civil liability (treble damages) for violations of section 1050. Section 1050

33

applies only to misrepresentations made to prospective employers other than the defendant. (*Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 288.)

Plaintiff's primary allegations in support of this cause of action are that defendants failed to file corrective reports with the California Medical Board and NPDB. He also alleges defendants have "misrepresented to prospective employers of [plaintiff] that the accusations against him are valid and remain in effect."

The trial court dismissed the cause of action because the SAC "lack[ed] facts regarding any report to an actual third party employer." On appeal, plaintiff points to his allegation that defendants did make misrepresentations to prospective employers. Defendants respond that the SAC lacks allegations that any misrepresentation by either defendant prevented plaintiff from obtaining employment with any particular employer.

Nothing on the face of the SAC shows plaintiff cannot add factual allegations and prove this cause of action. Plaintiff should have the opportunity to amend this cause of action to allege specific prospective employers to whom defendants allegedly communicated derogatory information about plaintiff and how such communication was intended to or did prevent plaintiff from obtaining employment. (See *Aubry*, *supra*, 2 Cal.4th at pp. 970–971 [leave to amend should be liberally granted where court perceives reasonable possibility defect can be cured by amendment].)

### viii.	Tenth and eleventh causes of action (negligence and negligence per se)

Plaintiff bases these causes of action on defendants' alleged failure to make supplemental filings with the California Medical Board and the NPDB and to comply with internal procedures relating to his administrative hearing.  The trial court concluded the SAC "sufficiently articulate[d] negligence" based on the filing failures but found defendants were entitled to immunity.

On appeal, plaintiff contends defendants' immunities do not apply to this cause of action.  As discussed *ante*, we agree to the extent plaintiff's causes of action do not rely on allegations concerning the conduct of the hearing, for which plaintiff does not dispute defendants are entitled to immunity under Government Code section 821.6.  Plaintiff contends he otherwise states causes of action for negligence and negligence per se.

As a preliminary matter, negligence per se is not a cause of action separate and apart from the cause of action of negligence.  "Negligence per se is an evidentiary doctrine, rather than an independent cause of action."  (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1210.)  On this basis, we affirm the trial court's order on plaintiff's negligence per se cause of action, without prejudice to plaintiff's ability to establish negligence by resort to the doctrine of negligence per se, codified at Evidence Code section 669.

Turning to substance, we agree with the trial court that plaintiff adequately alleged negligence based on defendants' breach of their duty to file corrective reports with the California Medical Board and the NPDB.

A cause of action for negligence arises when a defendant (1) has a legal duty to use due care; (2) breaches that duty; and

35

(3) such breach is the proximate or legal cause of injury to the plaintiff. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.) Evidence Code section 669 creates a presumption that the defendant failed to exercise due care where: "(1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (§ 669.)

Defendants contend plaintiff cannot establish their negligence in reliance on the physician reporting schemes embodied in Business and Professions Code section 805 and regulations pertaining to the NPDB as these schemes were designed to protect patients, not physicians. Any benefit to physicians, defendants argue, is therefore incidental. (See *Bologna v. City and County of San Francisco* (2011) 192 Cal.App.4th 429, 439–440 ["a benefit that is incidental to the enactment's purpose does not support tort liability under . . . Evidence Code section 669"].)

It is undoubtedly true that the overall purpose of the reporting schemes is to protect the public from unqualified physicians. (See *Stiger v. Flippin* (2011) 201 Cal.App.4th 646, 655–656; 42 U.S.C. § 11101.) However, it is also clear these schemes contain protections for physicians about whom derogatory information has been reported. Business and Professions Code section 805, subdivision (f)(3) requires filing of a supplemental report after the subject of a section 805 report "is

36

deemed to have satisfied any terms, conditions, or sanctions imposed as disciplinary action by the reporting peer review body." 45 Code of Federal Regulations part 60.6(a) similarly requires a person or entity who reported incorrect or incomplete information to the NPDB to file a correction to any "errors or omissions," and to update reports when a reported action has been reversed. While correcting or updating negative disclosures about a physician may have an incremental public benefit by increasing the number of qualified doctors available to provide care, the primary benefit inures to the physician whose ability to practice may be severely curtailed by an erroneous or outdated filing.

Defendants argue they had no duty to correct the prior filings under Business and Professions Code section 805 or 45 Code of Federal Regulations part 60.6 because the supplemental or corrective filing conditions were unmet as a matter of law. Taking plaintiff's allegations as true, we cannot agree. Plaintiff alleges defendants reported to the California Medical Board that he was subject to restrictions in his practice. He alleges these sanctions were based on allegations against him relating to the patient's complaint. He further alleges that, in terminating the administrative hearing against him, "[d]efendants agreed to dismiss the allegations against [him]." As the sanctions imposed against plaintiff were based on those allegations, we find it difficult to understand how plaintiff was not "deemed to have satisfied" the sanctions against him when the allegations were dismissed. (§ 805, subd. (f)(3).) If the allegations were dismissed, there could be no basis for continuation of the restrictions.

Likewise, the NPDB report references "restrictions upon [plaintiff's] practice." Reporting persons must report "reversal" of

37

a previously reported "professional review action"—which includes an action of a health care entity taken through professional review activity based on the subject's professional competence or conduct implicating patient welfare which "adversely affects or may adversely affect the clinical privileges" of the subject. (45 C.F.R. § 60.3.) To the extent defendants dismissed the allegations against plaintiff, they should have reported there were no longer grounds for restrictions. (Cf. *Van Boven v. Freshour* (Tex. 2022) 659 S.W.3d 396, 403–404 [failure to prove misconduct against physician rendered reported sanctions against him "error" such that supplemental reporting to NPDB was necessary].)

The trial court erred by sustaining defendants' demurrer to the negligence cause of action.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The trial court's order sustaining defendants' demurrer to the entire SAC is vacated. The trial court is instructed to enter a new order (i) sustaining, without leave to amend, defendants' demurrer as to plaintiff's causes of action for failure to perform mandatory duties, intentional misrepresentation, intentional interference with contractual relations, intentional interference with prospective economic relations, deprivation of due process rights, use of fabricated evidence, and negligence per se (without prejudice to plaintiff's right to rely on the evidentiary doctrine of negligence per se in pursuing his negligence cause of action); (ii) sustaining, with leave to amend, defendants' demurrer as to plaintiff's cause of action for misrepresentation preventing former employee from obtaining employment; and (iii) overruling defendants' demurrer to plaintiff's causes of action for intentional

38

infliction of emotional distress and negligence.  Plaintiff to recover costs.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.